UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DONOVAN JOSEPH,

Petitioner,

v.

CALVIN JOHNSON,[1] et al.,

Respondents.

Case No. 2:18-cv-02301-KJD-EJY

ORDER

I.   Introduction

Donovan Joseph ("Petitioner" or "Joseph") filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 1.) The Court denies the petition and a certificate of appealability.

II.  Background

A jury convicted Joseph of, *inter alia*, sexual assault and he was sentenced to life imprisonment with eligibility for parole after 10 years. (ECF No. 13-18.)

In his petition, Joseph claims, *inter alia*, his counsel[2] were ineffective because they did not (1) request a cautionary instruction; (2) object to the State's closing remarks; (3) object to the State's expert; and (4) call percipient and expert witnesses for the defense. (ECF No. 1.)

The Court summarizes trial evidence and related state court record material and proceedings as a backdrop to its consideration of the issues presented in the case.[3]

///

---

[1] According to the state corrections department's inmate locator page, Joseph is incarcerated at High Desert State Prison. The department's website reflects Calvin Johnson is the warden for that facility. At the end of this order, the Court directs the clerk to substitute Calvin Johnson for prior respondent Brian Williams, under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Joseph's trial attorneys will be referred to individually as "trial counsel" or "co-counsel," and collectively as "counsel."

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Joseph's claims.

1

1

**A. Events Prior to the Offenses**

2      Romy Minko testified that on January 22, 2014, she was 21 years-old and on vacation from

3   Melbourne, Australia at the Mirage hotel in Las Vegas, Nevada with three friends. (ECF Nos. 12-

4   46 at 4–6; 12-48 at 5–6.) She met Zach Smith for the first time at the roller coaster locker area at

5   New York New York. (ECF No. 12-46 at 8–9.) Minko and Smith rode the roller coaster together

6   and then Minko and her friends socialized with Smith and his coworkers, Joseph and Jerome Fogel,

7   at New York New York, the Mirage, and Mandalay Bay, where Minko had several shots and other

8   alcohol beverages. (ECF Nos. 12-46 at 8–14, 16, 23–24, 54–55, 59–60, 66; 12-51 at 70–74.)

9      Minko testified she and Smith kissed, held hands, were "leaning on each other," and

10   flirting, throughout the evening. (ECF Nos. 12-46 at 16, 22, 63; 12-48 at 18–19, 20–21, 50–51;

11   12-49 at 17–19.) One of Minko's friends reprimanded her for flirting excessively with Smith, but

12   Minko testified other than kissing, she did not intend sexual contact with Smith. (ECF Nos. 12-46

13   at 24, 48, 50; 12-49 at 17–18.)

14      Fogel[4] testified the group visited New York New York, the Mirage, and the Foundation

15   Room at Mandalay Bay. (ECF No. 12-51 at 79, 122–123.) Fogel said Minko and Smith were out

16   of his view much of the time, but their intimacy increased, and Smith said "some making out"

17   occurred while Smith and Minko shared a cab from New York New York to the Mirage. (*Id.* at

18   75–76, 79.) Fogel saw Minko consume alcohol beverages but did not see her eat. (*Id.* at 78, 88.)

19      Fogel said the group left Mandalay Bay at 10:00 p.m. because Smith had to catch a flight

20   to Miami. (*Id.* at 80.) Fogel drove to the airport with Minko and Smith in the backseat and Joseph

21   in the front passenger seat. (ECF Nos. 12-46 at 25–26; 12-51 at 84.) Fogel believed Minko agreed

22   to go with them, and that she knew they would stop at Smith's hotel before heading to the airport.

23   (ECF No. 12-51 at 81–82.)

24      Minko and Fogel each testified Minko was intoxicated when they waited in the car while

25   Smith and Joseph retrieved luggage from Smith's hotel. (ECF Nos. 12-46 at 26; 12-48 at 24–27;

26   12-51 at 83, 88.) Minko was concerned for her safety and told Fogel she felt uncomfortable and

27   wanted to return to the Mirage, but Fogel assured her, "don't worry, we're going to keep you safe"

28

---

[4] Minko and Fogel were the only individuals who testified about the group's activities.

and promised to return her to the Mirage. (ECF No. 12-46 at 27–28; 12-48 at 27; 12-49 at 14.) Fogel thought Minko was "afraid people might hurt her," because she commented "it was very hard being a girl" and he thought she was "panicking," and sounded "distressed." (ECF No. 12-51 at 93–95.) Fogel confirmed he assured Minko "no one was going to hurt her," and he "was going to ensure that she would be safe" and get back to her friends. (*Id.* at 95.) Minko said she was free to exit the car but remained because they told her they would return to the Mirage after retrieving the luggage. (ECF Nos. 12-48 at 25–29; 12-49 at 13–14.)

Fogel said his drive to the airport took about "seven, eight minutes," and during that time he personally saw Minko straddle Smith while facing him, with her skirt "lifted up around her waist," and saw them making out in the backseat. (ECF Nos. 12-51 at 84–86; 12-52 at 18.) Minko did not recall what she did in the backseat with Smith except that they were lying down. (ECF No. 12-48 at 29–30, 34, 45.) Fogel testified Minko got queasy after they dropped Smith at the airport, and he pulled over to the side of the road where she vomited while Joseph held her hair. (ECF Nos. 12-51 at 86–87, 97; 12-52 at 6.) Minko told police she felt "clear-headed" after she vomited, but testified she felt "a little drowsy." (ECF Nos. 12-48 at 32–35, 57; 12-49 at 7–8.)

After Minko vomited, Joseph got in the back seat with her, and she asked to return to the Mirage, but Joseph told her they would first drop off his luggage. (ECF No. 12-46 at 28.) Fogel testified Joseph suggested they take Minko to the Tropicana because it was closer and "he thought that she wouldn't make it" to the Mirage without vomiting. (ECF No. 12-52 at 7.) Fogel believed Joseph was planning to meet "an airline flight attendant" and then Fogel's wife was coming into town to vacation in Yosemite. (ECF No. 12-51 at 90.) Fogel said he had no plans to take Minko to the Mirage or see Joseph after he dropped them at the Tropicana because Joseph said he would take care of Minko. (ECF Nos. 12-51 at 90; 12-52 at 8–10.) After leaving Joseph and Minko at the Tropicana, Fogel returned to the airport to pick up another friend at 11:00 p.m. and then went to his hotel for the night. (ECF Nos. 12-51 at 109; 12-52 at 9.)

Minko testified she thought Fogel was parking the car (because the car could not remain in the valet area), and they would take her to the Mirage after they deposited Joseph's luggage. (ECF No. 12-46 at 28–29.) Minko agreed the Tropicana video depicts her holding hands with Joseph

and jogging to keep up with him as they walked to the elevator, but she explained that Joseph was helping her walk because she had difficulty due to her extremely high heels and intoxication. (ECF Nos. 12-46 at 29; 12-48 at 41–43; 12-49 at 15–16.) Minko agreed the video depicted Joseph rubbing her arm to calm her down because she was "crying" and "panicking" and telling him she wanted to go back to the Mirage, but she did not try to leave or seek help. (ECF Nos. 12-48 at 36–37; 12-49 at 16–17, 32.) Minko said she did not want to go with Joseph but did not leave because she did not suspect anything. (ECF Nos. 12-48 at 39–43; 12-49 at 16–17.)

B.   The Offenses

Minko testified that once she was inside Joseph's hotel room, she started "to panic" and "hyperventilate a little" because she "really wanted to go back to the Mirage" and realized "Smith wasn't there." (ECF Nos. 12-46 at 29, 38; 12-49 at 16.) She said Joseph sat her "down on the edge of the bed," and told her to relax and that "Smith will come back when you calm down." (ECF Nos. 12-46 at 29; 12-48 at 58–59; 12-49 at 16.) She agreed she could have left or called her friends for help but did not do so. (ECF No. 12-48 at 57–58.)

Minko said she tried to control her breathing but blacked out. (ECF No. 12-46 at 30.) She did not take anxiety medication but previously had panic attacks once or twice. (12-48 at 56–57.) She awoke lying on the bed with Joseph "stroking" her "crotch" outside her underwear. (ECF Nos. 12-46 at 30; 12-48 at 61.) She testified she did not want to have sex with Joseph and never gave him any indication she wanted to have sex with him. (ECF Nos. 12-46 at 38; 12-49 at 16.)

Minko said she realized she "wasn't safe," so when Joseph walked away, she said, "I have to go," and ran to the door without her shoes and purse and started to open it, but Joseph ran "up behind" her and "slammed the door." (ECF Nos. 12-46 at 30–31; 12-48 at 68–70.) Minko said there was "a fight" as she tried to open the door and he kept it closed. (ECF Nos. 12-46 at 31; 12-48 at 71.) She said he pulled her hair during the struggle and grabbed her arms and pulled her back towards the bed while she tried to release his grip and yelled, "help," "you can't do this," and "please don't do this." (ECF Nos. 12-46 at 31; 12-48 at 73, 75, 79, 82, 99; 12-49 at 6.) Minko said she was in fear for her life and screamed loudly. (ECF No. 12-48 at 72–74.)

///

4

Minko testified Joseph pulled her on to the bed and held her down with his entire weight, while he grabbed a pillow, but did not hit her. (ECF Nos. 12-46 at 31–33; 12-48 at 80, 96–101; 12-49 at 20.) She said he put the pillow over her face and said, "You don't want to get hurt, do you." (ECF No. 12-46 at 31; 12-48 at 80, 102–03, 107–08.) She said he removed the pillow when she stopped struggling so she cooperated out of fear she would not get out of the room if she continued to struggle. (ECF Nos. 12-46 at 32.)

Minko testified Joseph removed her panties, put his finger in her vagina, held her arms down, and inserted his penis into her vagina, while she tried not to cry. (ECF No. 12-46 at 32–34.) After he imposed sexual intercourse on her, Joseph removed her dress and forced her to kiss him. (ECF Nos. 12-46 at 35–36; 12-48 at 114–17; 12-49 at 31.) She said he pulled hard on her hair and forced her to straddle him. (ECF No. 12-46 at 35–36, 67–68; 12-48 at 117–18; 12-49 at 1.) She asked to go to the bathroom, but he said "No, do this first," pushed his penis into her mouth, and made her give him oral sex for a few minutes while he held her hair and pulled her head. (ECF No. 12-46 at 34–35; 12-48 at 120–22.) She was too afraid to bite his penis for fear it would make him angry and hurt her as he had already overpowered her, and she did not know whether he had, or might use, weapons. (ECF No. 12-49 at 21–22, 27.)

Minko said she told Joseph to let her go, but he told her to turn over, and with her face in the mattress, he held her hair and imposed sexual intercourse from behind. (ECF No. 12-46 at 34, 36–37.) He asked if she liked it, and pulled her hair when she did not respond, so she said yes to appease him, but she was afraid and did not like it. (*Id.* at 68.) Minko said she was an unwilling participant but asked him to use a condom because she did not want to get pregnant or a sexually transmitted disease. (ECF No. 12-46 at 38–39.) She heard a wrapper but did not know whether he used a condom or whether he ejaculated or not. (ECF Nos. 12-46 at 38–39; 12-48 at 119, 122–23.)

Minko testified Joseph let her go to the bathroom when he finished imposing intercourse from behind. (ECF Nos. 12-46 at 34–35; 12-48 at 123–24.) Minko did not think it was feasible to collect her things, so after using the bathroom, she ran out to the elevator, exited at the P level, "yelled for help," and ran to a "security guard." (ECF Nos. 12-46 at 37–38; 12-48 at 125.)

///

C.  Investigation

Tropicana security control officer, Jerome Driggers, testified that according to the hotel surveillance videos, Minko and Joseph entered the casino and walked to the elevators seeming to hold hands around 11:01 p.m. (ECF No. 12-43 at 28, 39–43, 54–55.) Minko stumbled but did not try to break away from Joseph. (*Id.* at 55–56.) Minko and Joseph rode the elevator to the ninth floor of the club tower and entered room 993 at around 11:07 p.m. (*Id.* at 42–44.) Minko exited the hotel room at 12:05 a.m. and ran naked down the hallway to the elevator. (*Id.* at 45, 61–62.) At 12:07 a.m., the video depicts Minko meeting Tropicana security guard, Danny Rosado, on the P level at the employee podium. (*Id.* at 45–46.) Driggers said the hotel received no noise complaints for Room 993 prior to Minko's exit from Joseph's room. (*Id.* at 53, 57–59.)

Rosado, testified Minko ran toward him from the elevator, while naked, screaming, and crying, and said, "she had been raped" and "someone was chasing her." (ECF No. 12-49 at 37–41, 46.) Rosado gave Minko his spare uniform, and although Minko described Joseph, she could not tell him on which floor the incident occurred. (*Id.* at 41–43.)

Tropicana manager, Rick Robison, testified he arrived at Rosado's desk at 12:12 a.m. to find Minko "shaking, crying" and "holding on to her head." (ECF No. 12-43 at 100–01.) Robison said hotel video revealed Minko exited room 993, and after confirming Joseph registered that room, he dispatched hotel security officer, Jeff Calvert, to the room. (*Id.* at 103–04.)

Meanwhile, according to Drigger's testimony, hotel video shows Joseph exited room 993 at 12:10 a.m., ran down the hallway to the elevator, exited at the convention level, rode the escalator, and returned to his room. (ECF No. 12-43 at 47–48, 61–62.) At 12:19 a.m., Joseph again exited room 993 and entered "the stairwell" located "almost right next to the room" only to return to the ninth floor through the stairwell door at 12:27 a.m. (*Id.* at 48–50.)

Fogel testified he was getting ready to go to sleep around 12:30 a.m. when he received a text message from Joseph asking him to "come get him." (ECF Nos. 12-51 at 91; 12-52 at 11.) When Fogel called Joseph a minute later to clarify his request, Fogel said Joseph "was distressed" and told him to "come get" him and hung up. (ECF Nos. 12-51 at 91; 12-52 at 11–12.)

///

6

Las Vegas Metropolitan Police Department ("Metro") Officer Callendar testified when he and Officer Marc Ashbock arrived at Tropicana that night, he found Minko "crying," "very distraught, upset, scared" while Ashbock went to Joseph's hotel room. (ECF No. 12-51 at 13–16.)

According to the hotel video, Joseph left room 993 with his luggage at 12:35 a.m. only to be stopped by Calvert, who testified Joseph "politely complied" when he told him a police officer was "on the way up and would like to speak to him." (ECF Nos. 12-43 at 51; 12-51 at 6–9, 11.) Ashbock testified Joseph said he had been alone in his room and was leaving to pick up his wife at the airport as she was due to arrive at 9:00 a.m. (ECF No. 12-51 at 41–44.)

Fogel arrived at Tropicana around 1:05 a.m., received no response to his text to Joseph, and went to Joseph's room where he found a security guard. (ECF Nos. 12-51 at 92; 12-52 at 12.)

Callendar testified he saw detectives "going through" Joseph's property and while detectives searched the hotel room pursuant to a warrant, he and Ashbock "searched the stairwells and hallways" "for any of the female's clothing" and "anything that might be pertinent to the investigation" but only went up "five or six floors" and did not search the stairwell for the 17th and 18th floors. (ECF No. 12-51 at 20–22, 37.) Callendar testified the detectives said, "there was no real clothing or anything in the hotel room." (*Id.* at 22, 35.) Tropicana security officer, Mark Moan, testified he located Minko's clothing and purse inside access panels in the stairwell for the 17th and 18th Floors. (ECF No. 12-49 at 51–57.)

D.  Physical and DNA Evidence

Metro senior crime scene analyst, Brenda Vaandering, collected buccal, penis, and hand swabs from Joseph. (ECF No. 12-43 at 76–81.) She testified room 993 was preserved before she entered and when she took photographs of the room, "it did not appear that there was a struggle in that room," as "[t]he comforter was still tucked underneath the mattress," although there were a "couple of pillows on the ground." (*Id.* at 83–84, 88, 93, 95–96.) She collected the bedding and pillowcases for testing but saw no hairs in the room or on the bedding. (*Id.* at 89–90, 94.)

Tina Ravish, a registered sexual assault nurse examiner ("SANE") testified she examined Minko a little after 4:00 a.m. and obtained buccal and other swabs from Minko's hands, and inside and outside her vagina, cervix, and rectal area. (ECF No. 12-54 at 49, 73–74.) Ravish said she

previously testified "30 to 40 times," in the 1980s and 1990s, but only testified one other time since the 1990s. (*Id.* at 14–15, 52–53.)

Ravish found no injuries to Minko's vaginal walls, cervix, or anus. (*Id.* 48, 57–58.) Minko reported pain when Ravish lightly touched a laceration on Minko's left labia. (*Id.* at 42–44.) Ravish said the laceration may or may not have bled. (*Id.* at 78–81, 99.) Ravish found small lacerations outside Minko's hymen and an abrasion on her posterior fourchette. (*Id.* at 43–48.) Ravish said fingernails can cause scratches on the hymen and exterior of the vagina. (*Id.* at 76.) Ravish said she applied a blue Toluidine dye, which includes isopropyl alcohol, to the lacerations so she could see them more clearly, and Minko immediately cried and said it burned. (*Id.* at 46–48.)

Ravish opined Minko's gynecological lacerations were "consistent with sexual assault," and although it was "possible" they resulted from consensual sex, in her opinion, it was "highly improbable," given lubrication is a factor. (*Id.* at 45, 84, 94–95, 100.) Ravish admitted Minko did not tell her about her activities with Smith earlier that night. (*Id.* at 63–65, 84–85.) On cross-examination, Ravish testified her findings would be no different had Minko told her she "got hot and heavy in the back seat with this guy driving from the Tropicana to the airport" and "straddled him" and "did all sorts of stuff." (*Id.* at 85–86.) Minko told Ravish the injuries occurred during the assault but Ravish admitted she had no way to verify that was true. (*Id.* at 90–91, 96.)

Ravish testified she found no injuries on Minko's forearms but found (1) "a thin rug burn" below Minko's "right clavicle;" (2) abrasions on her right elbow, right inner thigh, and two on her left upper arm; (3) a red area on her left knee; and (4) contusions on her right knee, left inner knee, and left lower leg. (*Id.* at 33–41, 71.) Ravish testified Minko complained about scalp tenderness but Ravish found no injuries. (*Id.* at 32–33, 60–61.) On cross-examination, Ravish said she did not know how Minko sustained her knee injuries but agreed vomiting on the side of the road while on her hands and knees "could" explain it. (*Id.* at 68–70.)

Ravish testified Minko had a "very red" "uvula" on the back of her throat, which, based on Minko's story, was "potentially" consistent with "blunt-force trauma from a penis to the back of her throat." (*Id.* at 33, 36, 91–93.) Ravish, however, admitted she did not know what caused the

injury, or when it occurred, and agreed vomiting could "potentially" affect that area of the throat. (*Id.* at 62–63, 91–93.)

Metro Forensic Scientist Crystal May testified she received three known buccal DNA samples from Minko, Joseph, and Rosado.[5] (ECF No. 12-49 at 71–72.) She also received oral, vaginal, cervical, rectal, and fingernail swabs from Minko and penile and hand swabs from Joseph. (*Id.* at 73–75, 77, 80.)

May did not find Joseph's DNA on Minko's vaginal, cervical, or rectal ("gynecological") swabs. (*Id.* at 88–90.) May said "semen was indicated by the initial test that told us to look a little bit further," for all three of Minko's gynecological swabs, however "on that second test we were looking for sperm, and all three were also negative for sperm as well as the initial semen indication." (*Id.* at 75) May said she would not necessarily expect to find a man's DNA on a female if the man wore a condom. (*Id.* at 96.) May said it is possible a man's DNA will appear in a vaginal swab if he penetrates with a finger, but she was aware of instances where "there could be DNA," but "we might just not be able to detect it." (*Id.* at 96–97.) May received a full profile consistent with Joseph's DNA from his penile swab, and "semen was indicated," but her follow-up test revealed no sperm. (*Id.* at 80.)

May found no biological substances on Minko's dress or inside her underwear. (*Id.* at 81–82.) However, a sample from the exterior crotch of Minko's panties was "consistent with a mixture of two individuals with at least one being male," and Joseph's DNA was assumed present because the result of his DNA profile was rarer than one in 700 million. (*Id.* at 84–85, 94.)

May testified it is possible to transfer DNA holding hands and for both of Joseph's hands "Minko could not be excluded as a partial deduced contributor." (*Id.* at 77–80, 92–93.) May confirmed Minko's fingernail samples had more than one contributor, but she was unable to identify them. (*Id.* at 76–77, 91–92.) May received no hair samples. (*Id.* at 87.) May saw "odd discoloration" on the pillowcases but detected no DNA profile or semen. (*Id.* at 85–86, 93–94.) She did not test the pillowcases for saliva. (*Id.* at 93–94, 96.)

---

[5] Police swabbed Rosado to eliminate his DNA because Minko wore his spare uniform; May found Rosado's DNA nowhere other than his sample swab. (ECF No. 12-49 at 88.)

The state appellate court affirmed Joseph's convictions and the state supreme court affirmed the denial of his state postconviction habeas corpus petition following an evidentiary hearing. (ECF Nos. 13-40, 13-80.)

III. Governing Standard of Review

A. Antiterrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for consideration of the petition:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693–694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403–04 (2000)). A court's ability to grant a writ is limited to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted)).

///

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06, and citing *Bell*, 535 U.S. at 694).

A state court's decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous;" rather, "[t]e state court's application of clearly established law must be objectively unreasonable." *Id.* (citing *Williams*, 529 U.S. at 409–410, 412).

To the extent the petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). Under this clause, federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972. Under 28 U.S.C. § 2254(e)(1), a state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 181.

///

///

11

1

### B.  Standards for Evaluating Effective-Assistance-of-Counsel

2      On petitioner's claims of ineffective assistance of trial and appellate counsel, he must

3  satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). *See also Smith v.*

4  *Robbins*, 528 U.S. 259, 285 (2000). Under *Strickland,* a petitioner must demonstrate (1) the

5  attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the

6  attorney's deficient performance prejudiced the petitioner such that "there is a reasonable

7  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

8  been different." *Strickland*, 466 U.S. at 687–88, 694. "A reasonable probability is a probability

9  sufficient to undermine confidence in the outcome." *Id*. at 694.

10      The Sixth Amendment does not guarantee the right to perfect counsel; it promises only the

11  right to effective assistance. *Burt v. Titlow*, 571 U.S. 12, 24 (2013). It is a petitioner's burden to

12  show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed

13  . . . by the Sixth Amendment." *Strickland,* 466 U.S. at 687. A petitioner making an ineffective

14  assistance claim "must identify the acts or omissions of counsel that are alleged not to have been

15  the result of reasonable professional judgment." *Id*. In considering such claims, a court is obligated

16  to "determine whether, in light of all the circumstances, the identified acts or omissions were

17  outside the wide range of professionally competent assistance." *Id*. When a court considers an

18  ineffective assistance of counsel claim it "must indulge a strong presumption that counsel's

19  conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689 (citation

20  omitted). On the performance prong, the issue is not what counsel might have done differently but

21  whether counsel's decisions were reasonable from his perspective at the time. *Id*. at 689–90.

22      Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a

23  reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at

24  690–91. "[A] particular decision not to investigate must be directly assessed for reasonableness in

25  all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. Strategic

26  choices made "after thorough investigation of law and facts relevant to plausible options are

27  virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete

28

12

investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "the standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Harrington*, 562 U.S at 104–05 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland's* deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

To prevail on an ineffective assistance of appellate counsel claim, a petitioner "must show a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Robbins*, 528 U.S. at 285–86. "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them to maximize the likelihood of success on appeal." *Id.* at 288 (citing *Jones v. Barnes,* 463 U.S. 745 (1983)). The Ninth Circuit has explained that the two *Strickland* prongs "partially overlap" when applying *Strickland* to a claim of ineffective assistance of appellate counsel:

> In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir. 1989) (citations and footnotes omitted). Failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice for the same reason – the issue had little or no likelihood of success on appeal. *Id.*

///

///

///

///

13

IV. Discussion

    A. Ground 1[6]

        1.  Grounds 1(A)(1) and 1(A)(2)

Joseph contends trial counsel were ineffective because they failed to obtain a limiting instruction informing the jury it could not consider evidence admitted as *res gestae* in determining consciousness of guilt and appellate counsel was relatedly ineffective because did not challenge the state district court's failure to give a cautionary instruction. (ECF No. 1 at 3–5.)

        a.  Additional Background

The State moved *in limine* to admit (1) video depicting Joseph entering the stairwell near his hotel room after Minko's exit; and (2) testimony that police found Minko's clothing and purse inside control panels in the stairwell. (ECF No. 12-28 at 5–9.) The State requested admission of the evidence as *res gestae*[7] to show the complete story of the events or, alternatively, as other act evidence to show consciousness of guilt, under NRS § 48.045(2)-(3). (*Id.*) The State requested a cautionary instruction should the trial court admit the evidence as "other act evidence." (*Id.* at 8.) The defense's written opposition to the motion included an unspecified request for a cautionary instruction should the court admit the evidence as *res gestae*. (ECF No. 12-32 at 4.)

///

[6] The Court subdivides ground 1 as follows: Ground 1(A)(1) alleges trial counsel was ineffective by failing to obtain a cautionary instruction. Ground 1(A)(2) alleges appellate counsel was ineffective by failing to challenge the state district court's failure to issue a cautionary instruction. Ground 1(B)1 alleges trial counsel was ineffective because he failed to object to the prosecutor's closing remarks concerning the semen evidence. Ground 1(B)(2) alleges trial counsel was ineffective by failing to object to the State's argument about the hotel room door lock clock. Ground 1(B)(3) alleges trial counsel was ineffective by failing to object to the State's argument about video from the Foundation Room. Ground 1(C) alleges trial counsel was ineffective during voir dire. Ground 1(D) alleges trial counsel was ineffective because he deferred opening statement.

[7] Nevada's *res gestae* statute, NRS § 48.035(3), stated, in relevant part:

Evidence of another act or crime which is so closely related to an act in controversy or a crime charged that an ordinary witness cannot describe the act in controversy or the crime charged without referring to the other act or crime shall not be excluded, but at the request of an interested party, a cautionary instruction shall be given explaining the reason for its admission.

A direct appeal challenge to a trial court's failure to issue a cautionary instruction upon request is subject to harmless error. *See Tavares v. State,* 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (An error that is not constitutional is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict.") (citing NRS § 178.598 and quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)).

The state district court received the defense opposition at the hearing on the motion, and "skimmed" it for the defense arguments. (ECF No. 12-35 at 4.) The court ruled: "I'm going to allow it. I do agree with the State that it's res gestae. I think that it's highly probative to the case. I think it's also intimately related to the facts of the incidents and I think it provides a complete picture of the events that transpired." (*Id.* at 6–7.) No one discussed a cautionary instruction.

At trial, counsel did not object to the evidence admitted as *res gestae*, did not request a cautionary instruction, and the state district court did not otherwise issue a cautionary instruction. (ECF Nos. 12-43 at 49, 67; 12-49 at 52–57; 12-54 at 11; 12-57 at 6; 12-58.)

In closing, the State argued hotel video depicted Joseph "carrying something" while entering the stairwell near his room after Minko left and later returning through the same stairwell door to reenter his room. (ECF No. 12-57 at 20, 28.) The State argued Minko's clothes and purse were found inside access panels in the same stairwell and urged the jury to infer "[Joseph] had those clothes and what appeared to be a backpack, ran to those floors far enough away from his floor and deposit (sic) those items in those access panels in an effort to conceal them." (*Id.* at 28.)

Trial counsel countered the State's suggestion that Joseph hid Minko's clothes was questionable because the video shows Joseph first "spent 10 minutes looking for [Minko]." (*Id.* at 50.) Trial counsel argued that the evidence suggested someone else hid Minko's belongings because Minko testified $150 was missing from her purse when it was returned to her, there was no evidence Joseph had cash, and police did not test the panels for fingerprints. (*Id.* at 51–52, 66.)

In rebuttal, the State argued the evidence showed Joseph hid Minko's clothes because the video depicted him leaving his room and entering the stairwell carrying something, the room was secured after Joseph's exit, and Minko's clothes were not in his room or bags. (*Id.* at 70, 87–88.)

At the state postconviction evidentiary hearing, trial counsel testified he was not aware he could request a cautionary instruction for the evidence admitted as *res gestae* but would have done so had he known because "it was a huge elephant in the room." (ECF No. 13-62 at 29, 42–43.) Co-counsel testified the evidence was "very damaging," "a big issue in the case," and it was "extremely" important to push back on it. (ECF No. 13-64 at 8–11.)

///

15

Joseph's appellate counsel testified he rejected a challenge to the state district court's failure to give a cautionary instruction because it "was abandoned by trial counsel." (ECF No. 13-62 at 84, 86–87.) Appellate counsel believed the State's motion was "unnecessary" because the evidence was "admissible," "as part of the crime" and because it "showed a guilty mind by the Defendant." (*Id.* at 85–86.) Appellate counsel did not know "what we would caution anybody about," and "[i]t's simply devastating evidence of guilt." (*Id.* at 87.) Appellate counsel said the State could use the evidence to show consciousness of guilt as "it is clearly part of the crime." (*Id.*)

### b.  State Court Determination

The state supreme court rejected these claims as follows:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and that prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland); see also Kirksey v. State,* 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996) (applying *Strickland* to claims of ineffective assistance of appellate counsel). Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). For purposes of the deficiency prong, counsel is strongly presumed to have provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *Strickland,* 466 U.S. at 690. We give deference to the district court's factual findings that are supported by substantial evidence and not clearly wrong but review its application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

> Joseph first argues that trial counsel should have challenged the trial court's failure to give a limiting instruction on res gestae evidence where both parties agreed in pretrial pleadings that such an instruction was warranted. Following pretrial motions on the admissibility of evidence that Joseph took the victim's clothing from his hotel room after she fled the room naked and hid the clothes in an access panel located in the stairwell eight floors above his room, the trial court ruled that the evidence was admissible as res gestae. Where res gestae evidence is admitted, a cautionary instruction indicating the reason for admitting the evidence shall be given upon request. NRS 48.035(3). Trial counsel testified at the postconviction evidentiary hearing that the defense wanted an instruction, the parties agreed during the pretrial litigation that it was appropriate, and the district court appeared willing to give such an instruction, but that counsel overlooked the issue at trial and failed to request the instruction. Based on this testimony, Joseph proved deficient performance. Joseph, however, has not shown prejudice—a reasonable probability of a different outcome—because an instruction telling the jury the clothing evidence was admitted to show the complete story of events would not diminish the evidence's probative value. Appellate counsel was not ineffective in omitting an appellate claim based on the absence of this instruction because the instruction is only mandatory where requested, and trial counsel had not requested

1   the instruction. The district court therefore did not err in denying these ineffective-
assistance claims.

2   (ECF No. 13-80 at 2–4.)

3           c.   Ground 1(A)(1) — Trial Counsel's Failure to Request a Cautionary Instruction

4           The Court conducts deferential review of the state supreme court's application of

5   *Strickland*'s prejudice prong for ground 1(A)(1) and concludes the state supreme court reasonably

6   determined a cautionary instruction explaining the evidence admitted as *res gestae* was admitted

7   for the purpose of explaining the complete story would not have reduced the probative value of

8   the evidence. Even apart from the video and testimonial evidence admitted as *res gestae*, the record

9   demonstrates there was ample evidence that Joseph was the only person who could have removed

10   the clothing and purse from his room and that he otherwise exhibited consciousness of guilt.

11           Hotel video depicted Minko entering Joseph's room fully clothed but leaving naked

12   without her clothing or purse. Hotel video confirmed Minko and Joseph were the only individuals

13   to enter and exit the room until police secured it after Joseph exited the room with his luggage.

14   Police did not find Minko's clothing in the room or in Joseph's luggage. Fogel testified Joseph

15   sounded distressed when he unexpectedly contacted Fogel to pick him up. Hotel security officer

16   Calvert and video surveillance demonstrated Joseph exited his hotel room with his luggage at

17   12:35 a.m., well before his wife's flight was due at 9:00 a.m. *See supra*, pp. 6–7.

18           The state supreme court reasonably concluded there is no reasonable probability the result

19   of the proceedings would have been different had counsel obtained a cautionary instruction that

20   the *res gestae* evidence was admitted for completion of the story and could not be used for

21   consciousness of guilt. Joseph is not entitled to federal habeas corpus relief for ground 1(A)(1).

22           d.   Ground 1(A)(2) — Appellate Counsel's Failure to Challenge the Omitted
23                Instruction

24           Despite counsel's initial written request in the opposition to the State's motion *in limine*,

25   counsel did not (1) request a cautionary instruction at the hearing on the motion *in limine*; (2)

26   object and request a cautionary instruction when the evidence admitted as *res gestae* was

27   introduced during trial; (3) submit a cautionary instruction when the parties submitted jury

28

17

instructions to the court; or (4) object to the State's closing remarks that the evidence admitted as *res gestae* supported consciousness of guilt.

The Court defers to the state supreme court's determination, as the final arbiter of Nevada law, that a cautionary instruction is only mandatory upon request. On this record, the state supreme court reasonably determined counsel did not "request" a cautionary instruction because nothing in the record demonstrates counsel submitted a specified instruction. Moreover, the state supreme court reasonably determined it was objectively reasonable for appellate counsel to conclude counsel "abandoned" the initial request and therefore omit a challenge to the state district court's failure to issue an unspecified cautionary instruction.

The Court defers to the state supreme court's application of *Strickland*'s performance prong to appellate counsel's actions and concludes it was objectively reasonable. Joseph is not entitled to federal habeas corpus relief for ground 1(A)(2).

2. Ground 1(B) — Counsel's Failure to Object to the State's Closing Remarks

a. Standards for Evaluating Prosecutorial Misconduct

 "[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *see also Parker v. Matthews*, 567 U.S. 37, 45 (2012) (acknowledging *Darden* is "clearly established law" governing prosecutorial misconduct claims under AEDPA).

To determine whether a prosecutor's comments rise to the level of a due process violation, courts examine the prosecutor's remarks in context based on the entire proceedings. *See Boyde v. California,* 494 U.S. 370, 384–85 (1990) (citations omitted); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Factors to consider when determining whether a prosecutor's comment "rendered a trial constitutionally unfair," include: (1) whether the comment misstated or manipulated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the prominence

of the comment in the context of the entire trial; and (6) the weight of the evidence. *See Hein v. Sullivan*, 601 F.3d 897, 912–15 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182).

Trial counsel is not constitutionally ineffective for failing to object to prosecutorial statements that are based on reasonable inferences from the record. *Trillo v. Biter*, 769 F.3d 995, 1002 (9th Cir. 2014); *see also Ayala v. Chappell*, 829 F.3d 1081, 1115 (9th Cir. 2016) (finding state court's rejection of ineffective assistance of counsel claims based on failure to object to prosecutor's statements that witnesses feared defendant, was not an unreasonable application of *Strickland* because the statements were "reasonably drawn from the witnesses' testimony" and failure to object was within the "wide range" of permissible professional legal conduct).

b.  State Court Determination

The state supreme court rejected the claims presented in that court as follows:

> Joseph next argues that trial counsel should have challenged the State's misstatement of the semen evidence in its closing argument. The State represented that the DNA analyst found semen on the victim's vaginal, cervical, and anal swabs. At trial, the DNA analyst testified that a first test indicated the presence of semen, warranting a secondary test for the presence of sperm. The analyst testified, "on that second test we were looking for sperm, and all three [samples] were also negative for sperm as well as the initial semen indication." The testimony is ambiguous as to whether the second test decisively rejected the presence of both sperm and semen or just sperm while affirming the initial positive indication of semen. Neither party followed up to clarify whether the presence of semen was excluded based on the second test.

> > [FN 3] Joseph has not included the report that was the basis of this testimony in his appendix. *See* NRAP 30(b)(3); *Greene v. State,* 96 Nev. 555, 558, 612 P.2d 686, 688 (1980) ("The burden to make a proper appellate record rests on appellant.").

> As the testimony was ambiguous, the State made permissible inferences from it, and an objection would have been futile. *See Klein v. State,* 105 Nev. 880, 884, 784 P.2d 970, 973 (1989) (explaining that it is proper for the prosecutor to argue reasonable inferences that may be drawn from the evidence). While the district court clearly erred in finding that trial counsel acknowledged that semen was found on the victim's underwear, Joseph nevertheless has not shown that trial counsel was ineffective. *See Ennis v. State,* 122 Nev. 694, 706, 137 P.3d 1095, 1103 (2006) (holding that counsel is not ineffective for omitting futile claims); *Wyatt v. State,* 86 Nev. 294, 298, 468 P.2d 338, 341 (1970) ("If a judgment or order of a trial court reaches the right result, although it is based on an incorrect ground, the judgment or order will be affirmed on appeal."). The district court therefore did not err in denying this claim.

> Joseph next argues that trial counsel should have challenged the State's misstatement of the door-lock and bar video evidence in its closing argument, arguing that the State misstated the number of minutes by which the hotel-door-

19

1
2
3
4

lock records were inaccurate and that surveillance video from the "Mix Lounge" bar was played when it was not. As the hallway surveillance video showed when the door was open such that the jury had the correct timeline, the degree of error of the door-lock records was not material. As the State represented in the contested portion of argument that the bar video purportedly played was not relevant, that argument is likewise not material. Accordingly, Joseph has not shown deficient performance or prejudice. The district court therefore did not err in denying this claim.

5    (ECF No. 13-80 at 5–6.)

6              c.    Ground 1(B)(1) – Failure to Object to the State's Remarks About Semen

7          Joseph contends counsel were ineffective because they did not object to the State's

8    argument that "semen allegedly detected on the swabs" was linked to Joseph. (ECF No. 1 at 5–6.)

9          In pre-trial instructions, the state district court informed the jury that evidence consists of

10   "sworn testimony by a witness while court is in session, and documents and other things received

11   into evidence as exhibits" and counsel's statements, arguments, and questions are not evidence.

12   (ECF No. 12-43 at 11.) Prior to closing remarks, the court further instructed "whatever counsel

13   may say, you will bear in mind that it is your duty to be governed in your deliberation by the

14   evidence as you understand it and remember it to be . . . ." (ECF Nos. 12-57 at 6; 12-58 at 31.)

15         In closing remarks, the State argued "[t]he DNA analyst testified that semen was found on

16   . . . [Minko]'s vaginal swabs, her cervical swabs, and her anal swabs," and "[t]hose swabs were

17   subsequently analyzed by DNA analyst Crystal May, and she detected semen on those three

18   swabs." (ECF No. 12-57 at 22.) The State argued semen was found on Josephs' penile swab,

19   Joseph's DNA was found on Minko's underwear, and Minko's DNA was found on Joseph's hands.

20   (*Id.*) The State did not argue Joseph's DNA was on any of Minko's gynecological swabs. (*Id.*)

21         Trial counsel argued in closing remarks that the State failed to prove Joseph's DNA was

22   found on any of Minko's gynecological swabs and suggested the alleged semen found in Minko's

23   gynecological swabs belonged to Smith. (*Id.* at 54–56, 60, 64.)

24         In rebuttal, the State reminded the jury that counsel's questions and arguments were "not

25   evidence" and told the jury to rely on its own memories of the testimony and evidence when

26   making its decision. (*Id.* at 68.) The State also addressed the semen evidence by arguing, "we have

27   semen" but "the semen did not have a DNA profile strong enough in order to be able to make a

28

comparison," and May never "excluded [Joseph] from that semen profile[;]" rather, "she just couldn't make a comparison, couldn't make a conclusion." (*Id.* at 88–89.)

At the state postconviction evidentiary hearing trial counsel testified that during trial, he believed May's reports indicated she found semen, but not sperm, and that her testimony was consistent with her reports. (ECF No. 13-62 at 31–33.) Trial counsel said he did not clarify May's testimony because, at the time, he thought it was consistent with her charts. (*Id.* at 32–33.)

The Court defers to the state supreme court's application of *Strickland*'s performance prong and concludes it was objectively reasonable to conclude objection was futile.

May testified she found semen on Joseph's penile swab. May's first test for Minko's gynecological swabs indicated the presence of semen, but her second test indicated semen was not present for either test. As the state supreme court noted, neither party reconciled May's potentially conflicting results, so the jury had to do so. *See supra*, p. 9.

On this record, it was futile for counsel to object because the state district court would have responded by reinstructing the jury to rely upon its own memory of May's testimony and not counsel's argument. Given the court twice previously instructed the jury on that point, and in rebuttal the State reminded the jury it must decide the verdict based on its memory of the evidence, not counsel's questions and argument (including its own), counsel's failure to object was objectively reasonable. Counsel's failure to object was also objectively reasonable based on counsel's obvious trial strategy, by which he emphasized in closing argument that the alleged semen might belong to Smith because May did not find Joseph's DNA in any of Minko's gynecological swabs. *See supra*, pp. 9, 21.

The state supreme court's application of *Strickland* to the record was objectively reasonable, and Joseph is not entitled to federal habeas relief on ground 1(B)(1).

d.   Ground 1(B)(2) — Failure to Object to the State's Door-Lock Remarks

Joseph contends counsel were ineffective because they failed to object to the State's closing remarks regarding Joseph's hotel room door-lock-clock report. (ECF No. 1 at 6.)

Robison testified all video within the casino "is on the same clock" and is "very close" to actual time but could be "off by one or two minutes." (ECF No. 12-43 at 110–11.) He further

testified the door-lock-clock for Joseph's hotel room was erroneous by "approximately 15 minutes." (*Id.* at 108.) On cross-examination, trial counsel posited the door-lock-clock discrepancy was only 5 minutes. (ECF No. 12-44 at 7–8.) Trial counsel did not object to the State's argument that, the door-lock-clock was "off by about 41 minutes." (ECF No. 12-57 at 83.)

The Court conducts deferential review of *Strickland*'s performance prong for ground 1(B)(2) and finds the state supreme court reasonably determined objection to the State's argument was futile because the door-lock- clock was irrelevant. The jury could rely on the hotel surveillance video for the actual timing of events and could interpolate the timing and sequence of the door activity by comparing the hotel video with the door-lock-clock report. Objection was futile because the state district court would have reinstructed the jury it must rely on the evidence, not argument.

Joseph is not entitled to federal habeas corpus relief on ground 1(B)(2).

e.   Ground 1(B)(3) — Failure to Object to Remarks About Foundation Room Video

Joseph contends counsel were ineffective because they did not object to the State's argument that Foundation Room video was in evidence. (ECF No. 1 at 7.)

At trial, the parties stipulated four videos titled "Mandalay Bay" 1–4 were admitted into evidence. (ECF Nos. 12-51 at 3–4; 13-12 at 36.) In closing remarks, the State explained the Mandalay Bay video was not relevant because it was from the Mix Lounge and Fogel testified the group went to the Foundation Room. (ECF No. 12-57 at 21–22, 74.) The State's argument asserted the jury saw videos from "Tropicana, New York, New York, and the Mirage" and the videos from Mandalay Bay were in evidence "as well." (*Id.*) Moreover, trial counsel repeatedly addressed the fact that the jury was unable to view the videos from Mandalay Bay. (ECF Nos. 12-48 at 17, 21– 22; 12-49 at 34–35.) On this record, all fairminded jurists would agree the State made no arguments based on video from the Foundation Room. Moreover, had trial counsel objected, the state district court would have reinstructed the jury it must rely on the evidence, not counsel's argument.

The state supreme court reasonably applied *Strickland*'s performance prong to ground 1(B)(3) in concluding objection was futile and Joseph is not entitled to federal habeas corpus relief on ground 1(B)(3).

///

22

3.   Ground 1(C) – Voir Dire

Joseph contends trial counsel was ineffective and infringed his constitutional right to remain silent by using the phrase "he said – she said" during voir dire. (ECF No. 1 at 7–8.)

During jury selection, the state district court asked the venire, "[a]re all of you aware that the defendant does not have to present any evidence in order for you to return a verdict of not guilty? Can everyone follow that instruction?" (ECF No. 12-40 at 45.) The court noted, "Everyone says yes. Great." (*Id.*)

During voir dire, trial counsel stated, "[t]he Constitution of the United States . . . affords us the right to remain silent," and "my client may choose not to testify" and then asked if the potential jurors would hold that against Joseph:

> [M]y client may choose not to testify. And not to say that this is a he-said/she-said case, but if it was, and you heard the government's witness take the stand and say, Mr. Joseph committed this crime against me, and I get to do my – the prosecution does their direct and I do my cross-examination, and you hear one side of the story, and when it comes time for the defense to present its case, Mr. Joseph does not take the stand; who here is going to require hearing from my client?

> Ms. Cook [Prospective Juror 527]. Now, if the judge was to instruct you that you couldn't hold it against my client, because he has a constitutional right to remain silent and he has the option of testifying, you need to understand that as his counsel and as – along with Mr. Smith, we advise him on what we think is the appropriate thing to do. It involves trials, involves strategy, involves – it's dynamic. A trial could start off one way and then the other and so on and so forth.

> So he may want to testify, he may not want to testify. And we may advise him differently. If the judge tell -- instructs you that you're not supposed to hold it against him if he does not testify, would there be something in the back of your mind that would probably say, I understand the judge told me that I'm not supposed to hold it against him, but you may still kind of have that feeling?

(ECF No. 12-41 at 4–6.) Prospective jurors 527, 563 and 595 expressed concerns about their ability to judge fairly and impartially should Joseph not testify. (*Id.* at 6–11.) Trial counsel responded by again explaining Joseph "has a constitutional right to remain silent" and "has the option of testifying or not testifying," the prosecution has the burden, and the defense need not present evidence. (*Id.* at 9–10.) All three prospective jurors were excused. (*Id.* at 32–33.)

After the jury was chosen, the state district court's introductory instructions reminded the jury: "[t]he defendant is not required to present any evidence or to prove his innocence," and "[t]he law never imposes upon a defendant in a criminal case the burden of calling any witnesses

23

or introducing any evidence." (ECF No. 12-4 at 7.) The court's pre-deliberation instructions also reminded the jury that Joseph had a constitutional right not to testify and the decision whether he should testify "is left to the defendant on the advice and counsel of his attorney," and the court cautioned the jury not to "draw any inference of guilt from the fact that he does not testify," and that it should not be discussed or entered into deliberations. (ECF No. 12-58 at 29.)

At the state postconviction evidentiary hearing trial counsel testified that, during voir dire, he had not determined whether Joseph would testify at trial. (ECF No. 13-62 at 30.) Trial counsel explained "he said/she said" meant "the testimony was her word against his and . . . there was (sic) no independent witnesses and there was nothing other than her allegations to support the government's case." (*Id.* at 30.) When asked whether there was anything to gain from the phrase "he said/she said," when it was unclear whether Joseph would testify, trial counsel said, "I felt comfortable with it." (*Id.*)

The state supreme court rejected the claim presented in that court as follows:

> Joseph next argues that trial counsel should not have characterized the case as a he-said-she-said case during jury selection because he was then prejudiced by not testifying. The record belies Joseph's framing. Trial counsel asked the potential jurors if they would respect a defendant's right to remain silent in a hypothetical he-said-she-said case. Trial counsel did not represent or imply that Joseph would testify, but rather properly examined potential jurors for their abilities to observe the presumptions that due process requires. *See Johnson v. State,* 122 Nev. 1344, 1354, 148 P.3d 767, 774 (2006) (observing that the purpose of jury selection is to determine whether the jurors will consider the facts impartially and apply the law as charged by the trial court); *cf. United States v. Udo,* 795 F.3d 24, 27, 30 (D.C. Cir. 2015) (considering whether counsel was ineffective for implying that the defendant would testify by characterizing the case as a he-said-she-said case during opening statement). Joseph has not shown deficient performance or prejudice on this ground. The district court therefore did not err in denying this claim.

(ECF No. 13-80 at 7–8.)

The Court conducts deferential review of *Strickland's* performance prong for ground 1(C). As the state supreme court reasonably determined, the state record demonstrates trial counsel's use of the he-said-she-said example to uncover which prospective jurors could not abide the time-honored due process presumption that Joseph had the right not to testify or present evidence proving his innocence, was objectively reasonable.

///

Trial counsel's strategy did not infringe Joseph's right to silence or right to decide whether to testify because trial counsel never promised Joseph would testify and never suggested Joseph's testimony was necessary for the jury's decision. To the contrary, trial counsel explained Joseph might wish to testify but nevertheless might not do so based on the advice of counsel rather than to avoid telling his side of the story; and the state district court's instructions supported trial counsel's explanations.

Trial counsel's strategy uncovered three prospective jurors who lacked an ability to honor the right not to testify and judge the evidence in the absence of Joseph's testimony. Trial counsel's strategy was favorable to Joseph as all three of the prospective jurors who voiced concerns about their ability to honor Josephs' rights not to testify and present evidence proving his innocence, were excused from service.

The state supreme court's application of *Strickland's* performance prong to this record was objectively reasonable, and Joseph is not entitled to federal habeas relief for ground 1(C).

4.  Ground 1(D) — Deferral of the Defense Opening Statement

Joseph contends trial counsel was ineffective because he deferred the defense opening statement. (ECF No. 1 at 8–9.)

Trial counsel delivered the defense opening statement after the prosecution rested. (ECF No. 12-51 at 60–65.) In his deferred opening statement, trial counsel argued Fogel would testify about things Minko did not tell the jury, and which were not depicted on the videos, to undermine her credibility, such as Fogel witnessed Minko and Smith having an "amorous, outrageous make-out session in the backseat" of the car on the way to the airport. (*Id.* at 61–63.) Trial counsel argued Joseph's wife would testify that Joseph's statements that she was flying to Las Vegas to go with him to Yosemite were true. (*Id.* at 63–64.)

At the state postconviction evidentiary hearing, trial counsel explained that deferring the defense opening statement is "[a] strategic decision that I've done many many times in the past" to limit the State's ability to tailor its case to rebut the defense. (ECF No. 13-62 at 30, 43–44.)

The state supreme court rejected the claim presented in that court as follows:

///

25

1
2
3
4

Joseph next argues that trial counsel should not have reserved his opening statement until immediately before the defense case. Trial counsel testified that, as a tactical matter, he typically reserves his opening statement so that he can address the evidence that the State has presented. Defense counsel has the right to reserve opening statement until immediately before presenting the defense case, NRS 175.141(2), and Joseph has not shown extraordinary circumstances warranting a challenge to counsel's tactical decision. The district court therefore did not err in denying this claim.

5   (ECF No. 13-80 at 8.)

6   As the state court record demonstrates, trial counsel had an objectively reasonable strategic

7   purpose for deferring the defense opening statement and utilized it as an added opportunity to

8   argue the defense case without disclosing the particulars to the prosecution while the prosecution

9   still had the opportunity to tailor a response in its case in chief.

10   The state supreme court's application of *Strickland*'s performance prong to the record was

11   objectively reasonable, and Joseph is not entitled to federal habeas relief for ground 1(D).

12   B.   Ground 2 — Failure to Disclose Foundation Room Video

13   Joseph contends the State violated *Brady* by withholding impeaching video of Minko and

14   Smith at Mandalay Bay's Foundation Room. (ECF No. 1 at 9–12.)

15   "[T]he suppression by the prosecutor of evidence favorable to an accused upon request

16   violates due process where the evidence is material either to guilt or to punishment irrespective of

17   the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United*

18   *States v. Bagley,* 473 U.S. 667, 676–77 (1985) (holding the duty under *Brady* encompasses

19   impeachment evidence). Evidence is material "if there is a reasonable probability that, had the

20   evidence been disclosed to the defense, the result of the proceeding would have been different."

21   *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine

22   confidence in the outcome." *Id.*

23   "There are three components of a true *Brady* violation: (1) the evidence at issue must be

24   favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the

25   evidence must have been suppressed by the State, either willfully or inadvertently; and (3)

26   prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "Mere speculation

27   that some exculpatory material may have been withheld is unlikely to establish good cause for a

28

1  discovery request on collateral review," nor "should such suspicion suffice to impose a duty on

2  counsel to advance a claim for which they have no evidentiary support." *Id.* at 286.

3      During Minko's cross-examination, trial counsel repeatedly noted the parties were unable

4  to, did not have, and had not seen, surveillance video from Mandalay Bay. (ECF Nos. 12-48 at 17,

5  21, 22; 12-49 at 34, 35.)

6      In closing arguments, the State argued:

7          [Y]ou saw video surveillance from Tropicana, the New York New York,
        and the Mirage, that are consistent with the events as testified to by Romy Minko.
8          Now, there were also videos from Mandalay Bay were (sic) played in evidence
        from the Mix Lounge at Mandalay Bay. Clearly, there was no relevant video from
9          the Mix Lounge, because clearly they were at the Foundation Room, as testified to
        by Jeff Fogel. But that – that video is already in evidence, as well.
10
          But from these three casinos, we saw here in open court the interactions of
11        the defendant and his group and Romy and her group as the evening progressed

12      . . . .

13  (ECF No. 12-57 at 19, 21–22.) In rebuttal, the State explained the Mandalay Bay video depicted

14  the Mix Lounge because Minko thought that was where they visited. (ECF No. 12-57 at 74.)

15      The state supreme court rejected the claim presented in that as follows:

16          Joseph next argues that the State withheld material, exculpatory evidence
        by failing to produce video of the victim and a third party engaging in escalating
17        romantic activity at a bar. This claim could have been raised on direct appeal and
        is thus waived absent a showing of good cause and actual prejudice, which Joseph
18        has not made. *See* NRS 34.810(1)(b)(2); *State v. Huebler,* 128 Nev. 192, 198, 275
        P.3d 91, 94-95 (2012). The district court therefore did not err in denying this claim.
19

20  (ECF No. 13-80 at 8.)

21      Where a state court denied a claim on state procedural grounds, it is procedurally defaulted

22  unless the petitioner can show cause and prejudice. *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir.

23  2011) (citing *Coleman v. Thompson*, 501 U.S. 722, 729–30, 746–47 (1991) (additional citation

24  omitted)). State procedural rules must be both independent and adequate to bar federal habeas

25  review. *Cooper,* 641 F.3d at 327 (citing *Ake v. Oklahoma*, 470 U.S. 68, 75, (1985) (additional

26  citations omitted)).

27      In *Cooper*, the state supreme court found the petitioner demonstrated cause for not earlier

28  raising a *Brady* claim but failed to demonstrate prejudice. *Cooper*, 641 F.3d at 326. The federal

27

district court found the petition procedurally barred. *Id.* On appeal, the Ninth Circuit acknowledged it previously held Nevada's state procedural bars, NRS §§ 34.726(1) and 34.810(2), constituted independent state grounds for purposes of procedural default analysis. *Id.* at 332 (listing cases so holding). Nonetheless, the Circuit held the state law "cause-and-prejudice" inquiry dovetails precisely with the merits of a federal *Brady* claim because "the second and third *Brady* components parallel the good cause and prejudice necessary to overcome the procedural default bars, such that proving the State withheld evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice." *Id.* at 332–33. The Circuit concluded the Nevada procedural bar was not independent and adequate and did not bar federal habeas review of a *Brady* claim. *Id.* (citing *Ake*, 470 U.S. at 74–75 (holding federal habeas review not precluded because state procedural bar depended on an antecedent ruling on federal law)).

In accordance with *Cooper*, the Court concludes on deferential review that the state supreme court reasonably determined Joseph failed to show cause and prejudice to support a *Brady* claim on this state court record.

The State argued the Mandalay Bay videos admitted into evidence were not relevant because they depicted the Mix Lounge, not the Foundation Room. The State's argument that the jury saw videos from "Tropicana, New York, New York, and the Mirage" and the videos from Mandalay Bay were in evidence "as well" could only reasonably be construed as a reference to the Mandalay Bay video for the Mix Lounge and cannot reasonably be construed as an assertion the State possessed video for the Foundation Room. It is speculative to conclude, from the State's closing remarks, that it suppressed Foundation Room video, particularly where, as here, trial counsel was aware the Mandalay Bay video did not depict the Foundation Room.

The state supreme court's finding that Joseph failed to demonstrate cause and prejudice to excuse his failure to raise his *Brady* claim on direct appeal, was neither contrary to, nor an unreasonable application of, Supreme Court authority, and was not based on an unreasonable determination of the facts. Joseph is not entitled to federal habeas corpus relief on ground 2.[8]

---

[8] Under Rule 6 of the Rules Governing Section 2254 Cases, "[a] district court sitting in a habeas case retains the discretion to permit additional discovery if the petitioner presents 'good cause' to do so." As explained here, Joseph's requests for discovery of Foundation Room video are based on unsupported speculation that such videos are

1    C.  Ground 3[9]

2       1.  Ground 3(A) – Failure to elicit testimony from Fogel and Smith

3       Joseph contends counsel were ineffective because they did not investigate and present

4    additional testimony from Fogel, and testimony from Smith, about Minko's sexual activity with

5    Smith as an alternate source for Minko's injuries. (ECF No. 1 at 12–15.)

6       The state supreme court did not address these claims.[10] Because "the interests of comity

7    and federalism will be better served by addressing the merits forthwith" than "by requiring a series

8    of additional state and district court proceedings before reviewing the merits," the Court reviews

9    the claims *de novo. Granberry v. Greer,* 481 U.S. 129, 134 (1987).

10      The state court record shows counsel's performance was neither deficient nor prejudicial

11   under *Strickland*.

12      At the state postconviction evidentiary hearing, Fogel testified he told trial counsel he

13   observed Minko having "some sort of panic attack" and thought she was "unstable" during the

14   time they waited in the car for Smith and Joseph to retrieve Smith's luggage. (ECF No. 13-64 at

15   34.) Fogel said Minko asked "are you guys good guys," and Fogel said he did not know if she was

16   frightened "or if she had been a victim of previous abuse." (*Id.*) Although Fogel made "very little"

17   observations of Smith during the car ride, he heard comments from the back seat like "need to get

18   our clothes back" or need to "get ready," so he stopped the car at a stop sign. (*Id.*) Fogel said

19   Minko rearranged her clothes while Smith exited the car, "pulled up his pants," "re-tucked his

20   shirt," "zipped his pants," and "buckled his belt." (*Id.* at 30–31.)

21      Trial counsel testified he spoke with Fogel a couple of times about his testimony and

22   "prepped" him once before he testified at trial. (ECF No. 13-62 at 14, 38.) Trial counsel testified

---

23   in the State's possession. Joseph cannot demonstrate "good cause" under Rule 6 and his requests for an order that the
24   State disclose Foundation Room videos and for an evidentiary hearing are denied. (ECF No. 1 at 11–12.)

25   [9] The Court subdivides ground 3 as follows: Ground 3(A) alleges counsel were ineffective because they failed
     to investigate and elicit testimony from Fogel and Smith about Minko's sexual activities with Smith. Ground 3(B)
26   alleges counsel were ineffective because they failed to object to the State's tardy disclosure of Ravish's curriculum
     vitae. Ground 3(C) alleges counsel were ineffective because they failed to call medical experts.

27   [10] Joseph did not present these claims to the state supreme court. (ECF Nos. 13-55 at 33–73; 13–79; 13-80.)
28   Joseph raised these claims in his federal habeas petition, and Respondents answered them on the merits. (ECF Nos. 1
     at 13–15; 5 at 2–3; 11; 24 at 18–21; 30 at 16–18.)

29

Joseph and Fogel told him they saw Smith and Minko engaged in "physical sexual 'vaginal' penetration." (*Id.* at 37.) Trial counsel admitted he could have asked Fogel about it but did not. (*Id.* at 37–38.) Trial counsel said Fogel told him he stopped the car before reaching the airport and Smith got out and tucked in his shirt and zipped his pants. (*Id.* at 14.) Trial counsel did not recall why he did not ask Fogel about Smith's need to tuck and zip, but thought it was consistent with trial testimony. (*Id.* at 16.) Trial counsel testified he was unable to secure Smith's attendance by subpoena because Smith was an out-of-state witness who did not accept service of counsel's subpoena and was unwilling to testify voluntarily. (*Id.* at 12.)

Trial counsel's failure to elicit testimony that Minko and Smith had sexual intercourse was not objectively unreasonable or prejudicial because such testimony would not contradict or undermine Minko's testimony that Joseph repeatedly raped her. *See supra*, pp. 4–6. Such testimony would also not contradict or undermine the evidence of Joseph's consciousness of guilt, including his hiding Minko's clothes after she escaped from his hotel room naked and his attempt to flee the hotel. *See supra*, pp. 3–7. Moreover, such testimony would not contradict Ravish's testimony about Minko's gynecological injuries because Ravish agreed Minko's injuries could have resulted from consensual sex and admitted Minko did not tell her about her make out session with Smith in the backseat of the car that night. *See supra*, pp. 8–9.

Trial counsel's failure to elicit additional testimony from Fogel that he saw Minko and Smith engaging in coitus was objectively reasonable and not prejudicial because doing so ran the obvious risk that Fogel would lose credibility as a defense witness because he was driving a vehicle at night during that observation. Likewise, trial counsel's failure to elicit Fogel's testimony that Smith tucked in his shirt and zipped his pants was objectively reasonable and not prejudicial because being in a state of undress does not conclusively prove sexual intercourse or injuries occurred with Smith any more than the evidence that was already presented at trial. Trial counsel's failure to call Smith as a witness was objectively reasonable because Smith declined service of the trial subpoena and refused to voluntarily testify.

There is no reasonable probability the result of the proceedings would have been different had Fogel and Smith testified that Minko had sexual intercourse with Smith because trial counsel

used Fogel's existing trial testimony that Minko straddled Smith with her dress lifted up around her waist while making out in the backseat of the car, and the absence of Joseph's DNA on Minko's gynecological swabs, to argue Minko had sex with Smith, which was a plausible argument given Minko testified she did not recall what she did in the backseat with Smith. *See supra*, pp. 3, 21.

Trial counsel's failure to elicit Fogel's updated opinion about Minko's state of mind was objectively reasonable as it duplicated Fogel's trial testimony, was otherwise speculative, and would have undermined Fogel's credibility as a defense witness. *See supra*, pp. 2–3.

On this record, counsel's decisions not to elicit testimony from Smith or additional testimony from Fogel to show Minko had sexual intercourse and obtained her injuries from her activities with Smith, were objectively reasonable and there is no reasonable probability that the result of the proceedings would have been different had counsel done so. Accordingly, Joseph is not entitled to federal habeas relief for ground 3(A).

       2.  Ground 3(B) — Failure to Object to the State's Improper Expert Disclosure

Joseph contends counsel were ineffective because they failed to object to the State's tardy disclosure of Ravish's curriculum vitae and seek to preclude her testimony, and appellate counsel was ineffective because he did not challenge the improper expert notice. (ECF No. 1 at 16.)

       a.  Additional Background

On April 8, 2014, the State noticed its intent to call SANE nurses Jeri Dermillian and Tina Ravish and later disclosed each of them in supplemental witness notices on May 8 and 30, 2014. (ECF Nos. 12-22 at 3; 12-27 at 3; 12-37 at 3.) On the first day of trial, June 2, 2014, the parties stipulated that, due to scheduling, the State could reopen its case to call its SANE expert (Ravish) after the presentation of the defense case, subject to the defense's right to reopen its case and call witnesses to rebut Ravish's testimony. (ECF No. 12-40 at 3–11.)

At the state postconviction evidentiary hearing, trial counsel testified that when he reviewed Ravish's report, he "didn't think that this was going to be that much of an issue" and thought her testimony "wouldn't be damaging." (ECF No. 13-62 at 22.) Trial counsel considered retaining a SANE expert but believed he could use Fogel's testimony about the ride to the airport to explain "any kind of bruising or any kind of physical causality on the victim . . . ." (*Id.* at 16–

17.) Trial counsel testified he received Ravish's curriculum vitae "very late" and failed to notice the long lapse in Ravish's employment until she testified. (*Id.* at 18, 22–23.)

Joseph's appellate counsel testified that an improperly noticed expert might be excluded at trial, but he did not consider raising a claim that Ravish was improperly noticed. (*Id.* at 88–89.)

    b.  State Court Determination

The state supreme court rejected the claim presented in that court on the following basis:

> Joseph next argues that trial counsel should have challenged the State's sexual-assault-nurse-examiner (SANE) expert as improperly noticed where the nurse's curriculum vitae was not provided until the day of trial. A party intending to call an expert witness must provide the opposing party with a copy of that witness's curriculum vitae at least 21 days before trial. NRS 174.234(2)(b), *held unconstitutional on other grounds by Grey v. State,* 124 Nev. 110, 178 P.3d 154 (2008). Even if counsel's performance was deficient, Joseph has not shown prejudice where (1) an objection would not have necessitated exclusion of the nurse's testimony given the several remedial options available to the trial court short of excluding the witness, *see* NRS 174.234(3)(b); *Grey,* 124 Nev. at 119-20, 178 P.3d at 161 (providing that, as a remedy for an inadequately noticed expert witness, a court may prohibit the expert from testifying, grant a continuance, or order other relief as it deems appropriate); (2) trial counsel did not consider the late disclosure a sufficient hindrance to request a continuance, *see id.* at 120, 178 P.3d at 161 (considering factors in assessing whether inadequate notice of an expert affected the defendant's substantial rights); (3) the State had properly noticed another nurse who was available to testify as to her own independent conclusions on the SANE report;

> > [FN 2] Joseph's argument that another expert would not have been permitted to testify regarding the SANE report pursuant to *Bullcoming v. New Mexico,* 564 U.S. 647 (2011), fails. *Bullcoming* prohibited the admission of a *testimonial report* where the report's author did not testify, 564 U.S. at 652—to be distinguished from a situation where a different expert witness was asked for an independent opinion based on reports that are not themselves admitted, *id.* at 673 (Sotomayor, J., concurring in part). *See generally Vega v. State,* 126 Nev. 332, 340, 236 P.3d 632, 638 (2010) (holding that expert's independent opinion did not violate the Confrontation Clause even though the reports it was based upon would)[sic]

> and (4) trial counsel considered the nurse's testimony so lacking in credibility, and thus non-prejudicial, that a defense expert was not warranted to rebut it. Joseph has also not shown that appellate counsel was ineffective in omitting this issue, as Joseph has not shown that the State acted in bad faith or that a different verdict would have resulted had the testimony been excluded or proper notice been given. *See Mitchell v. State,* 124 Nev. 807, 818-19, 192 P.3d 721, 729 (2008). The district court therefore did not err in denying this claim.

(ECF No. 13-80 at 4–5.)

///

The state supreme court reasonably determined there is no reasonable probability the result of the proceeding would have been different had trial counsel objected to the tardy disclosure.

First, the Court defers to the state supreme court's finding, as the final arbiter of Nevada law, that if counsel had objected to the tardy disclosure, the trial court had options short of entirely precluding Ravish's testimony, and such preclusion would have only been justified had the circumstances indicated the State withheld the vitae in bad faith.

Second, the evidence demonstrates Joseph was not prejudiced by the late disclosure. Ravish's testimony occurred at the end of the trial after the defense case in chief, subject to the defense's right to call its own witnesses to rebut Ravish's testimony, which trial counsel did not find necessary. Despite its tardiness, trial counsel used the vitae's contents to undermine Ravish's credibility by exposing her inexperience when he elicited her admission that she testified as a SANE nurse only one other time since the 1990s. Trial counsel also elicited Ravish's concessions about her most damaging opinions, including her admissions that it was possible Minko's injuries resulted from consensual sex and she did not know when or how Minko sustained her injuries. Counsel relied on those admissions to argue Ravish's findings supported the defense theory that Minko's injuries were the result of her consensual activities with Smith. *See supra*, pp. 8–9.

On this record, the state supreme court's application of *Strickland* and conclusion there was no reasonable probability the result of the trial or appellate proceedings would have been different had trial counsel objected to the tardy disclosure, or had appellate counsel challenged the tardy notice on appeal, were objectively reasonable, and Joseph is not entitled to federal habeas relief for ground 3(B).

3.   Ground 3(C) – Failure to Hire Defense Medical Experts

Joseph contends counsel were ineffective because they failed to retain medical experts to refute Ravish's testimony and to assert that a panic attack could alternatively explain Minko's naked exit from Joseph's hotel room. (ECF No. 1 at 17–21.)

a.   Additional Background

At the state postconviction evidentiary hearing, Dr. Angel Rigueras testified he is a board-certified interventional physiatrist, specializing in physical medicine and rehabilitation, with a

subspecialty in bones, muscles, joints, and nerves, and is licensed to practice medicine in Michigan and Florida. (ECF No. 13-62 at 50–51.) As Joseph's friend since at least high school, he offered his expert services for Joseph's case, but counsel did not follow up with that offer. (*Id.* at 54.) Rigueras reviewed the medical notes, sexual assault exam report, trial testimonies, and photographs before his postconviction hearing testimony. (*Id.* at 55.)

Rigueras opined Minko's vaginal tears were consistent with "dry sex" grinding while atop Smith with his pants unzipped in the back seat of the car. (*Id.* at 60.) Rigueras expected deeper lacerations within the vagina with penetration. (*Id.* at 61.) Rigueras agreed Minko's uvula exhibited a "little mild redness," but "any sort of gastric juice" and raising of the palate for forceful projectile would irritate and inflame those tissues. (*Id.* at 58–59.) Rigueras could not say whether the uvula injury was from a penis but opined "forceful-type introduction of the penis to the back of the throat" would induce a gag reflex or choking effect, and there was no description of that here. (*Id.* at 59.) Rigueras thought the bruises on Minko's knees were consistent with kneeling on gravel or pebbles to vomit. (*Id.* at 60.)

Rigueras thought Minko's hair pulling allegations were unsupported by the physical evidence because violent hairpulling would have resulted in more than scalp tenderness such as "petechial, bruising, bleeding, something of that nature." (*Id.* at 57–58.) He said one would expect to find some sort of trauma or hair loss that wasn't present." (*Id.* at 58.) However, he testified a medical doctor is unnecessary to know that one would have expected "loose hairs" where it happened, and the senior crime scene analyst's report indicates none were in the hotel room. (*Id.*)

Rigueras could not say whether it was a sexual assault or a panic attack that made Minko leave Joseph's room, but a panic attack was an applicable explanation. (*Id.* at 65.) He said Minko's panic attack was possibly related to her leaving the room naked because "panic attacks can make you feel doom," and "they'll tell you gloom and doom that everything's closing in around you at that moment and that'll make you do things that normally you wouldn't do." (*Id.*) He said people suffering a panic and anxiety episode may misinterpret a situation because they are unaware that they are having an episode. (*Id.* at 64.) Rigueras said this was relevant because Minko suffered a panic attack in Joseph's room and alcohol can exacerbate disorientation during a panic attack. (*Id.*)

Registered and board-certified SANE nurse, Judy Malmgren, testified she reviewed medical records, the sexual assault report, photographs, Minko's statements, the testimony of Fogel, Minko, and Ravish, trial counsel's closing arguments, before she testified at the postconviction evidentiary hearing. (ECF No. 13-64 at 38.)

Malmgren testified Ravish was incorrect about Toluidine blue dye because it is water-based, has no alcohol, and causes no pain when applied or removed, but might feel cold. (*Id.* at 40–41.) Malmgren said Ravish incorrectly located the laceration on the labia majora because in her opinion, it is in the labial sulcus, which is between the labia majora and labia minora. (*Id.* at 41.) Malmgren said Ravish incorrectly identified the injury as "continuously from 12 to 6," because in her opinion, there are areas of "superficial injury in the area from 12 to 6, but not the entire 12 to 6 area." (*Id.*) Malmgren agreed there were lacerations to the hymen, but characterized them as "very superficial," and said they would not have bled although they would have "felt tender." (*Id.* at 42.) Malmgren said the dye did not reveal an abrasion "extending from the fossa navicular to the posterior fourchette," as Ravish asserted. (*Id.* at 43.) Malmgren said Ravish was also wrong when she said there was bruise on the hymen because hymenal tissue color ranges from pinkish to blueish and darker coloration can be mistaken for bruising. (*Id.* at 43–44.)

Malmgren said Ravish's statement that the redness on the uvula "indicated" blunt force trauma from a penis to the back of the throat was not based on literature, research studies, or clinical studies, but agreed vomiting could have caused it. (*Id.* at 46–47.) Malmgren said a penis does not generally cause redness to the uvula and if it did, one would see "tiny pinpoint bruising" to the hard palate in back of the throat, which there is not. (*Id.* at 47.)

Malmgren testified all Minko's injuries were consistent with digital penetration and actual penetration, whether consensual or non-consensual. (*Id.* at 48, 55.) Malmgren said there is "no "criteria" for differentiating consensual from nonconsensual sex. (*Id.* at 49.) Malmgren said no literature supports Ravish's opinion that it was highly improbable Minko's injuries resulted from nonconsensual sex. (*Id.* at 57–58.) Malmgren opined the injuries could have been caused by friction and rubbing if Minko's vagina contacted Smith's zipper. (*Id.* at 49–50.)

///

Trial counsel testified Rigueras contacted him about testifying at Joseph's trial, but he rejected that offer because he thought Riguera's life-long personal friendship with Joseph would expose Rigueras to "substantial cross-examination based on bias." (ECF No. 13-62 at 23–25.)

Trial counsel testified he considered hiring an expert to contradict the SANE nurse's testimony but "didn't think it was necessary" as her testimony was not strong, and he could discredit her with other testimony and cross-examination concerning Minko's activities with Smith and the lack of evidence of hair or a struggle in the hotel room. (*Id.* at 16–17.) Trial counsel did not think an expert was needed to rebut Ravish's testimony that the redness to Minko's throat was caused by a penis because he "thought common sense rebutted that allegation." (*Id.* at 26.)

Trial counsel further testified he did not think a medical expert would be valuable to rebut Minko's physical injuries "given the nature of the defense." (*Id.* at 40–41.) Trial counsel explained Minko consumed "an exorbitant amount of alcohol all weekend and the video showed her stumbling and falling down multiple times;" yet, despite her claims, she had no injuries to her scalp and police found no hair in the hotel room. (*Id.* at 25–26.)

Trial counsel said he became aware of Minko's panic attacks during her trial testimony but did not incorporate it into the defense or hire an expert because, based on his knowledge about panic attacks as a prior medical student before law school, he did not think it was relevant to the defense or explain her exit from the hotel room naked. (*Id.* at 26–28.) Trial counsel said Minko's inebriation and her intimacy with someone else beforehand, was a more reasonable and believable explanation for her flight from the room naked. (*Id.* at 27–28, 42.) He thought the jury understood people of Minko's age respond to alcohol by acting irrationally. (*Id.* at 27–28.)

b.  State Court Determination

The state supreme court rejected the claim presented in that court on the following basis:

> Joseph next argues that trial counsel should have retained a medical expert to rebut the nurses' testimony. Trial counsel testified that he believed common sense rebutted several assertions the nurse made and undermined her credibility, such that a defense medical expert was not warranted. He also testified that he concluded that an expert was unnecessary because the victim's allegation that the sexual assault followed a violent struggle was undermined by evidence that the hotel room was undisturbed, that the victim had a sexual encounter earlier that evening with a third party, and that showed other inconsistencies with the victim's account. Further, trial counsel considered calling Joseph's childhood friend who is a medical doctor (and

1
2
3
4
5
6

who testified at the postconviction evidentiary hearing) but declined to do so because the risk of impeachment on bias was too great. Insofar as Joseph argues that trial counsel should have explained the victim's behavior through her history of panic attacks, trial counsel knew of that history, concluded that it was not relevant, and declined to pursue that theory in developing the defense strategy. Decisions regarding what witnesses to call or defenses to develop are tactical decisions that rest with counsel, *Rhyne v. State,* 118 Nev. 1, 8, 38 P.3d 163, 167 (2002), and counsel's tactical decisions are virtually unchallengeable, absent a showing of extraordinary circumstances, which Joseph has not made, *see Lara v. State,* 120 Nev. 177, 180, 87 P.3d 528, 530 (2004). The district court therefore did not err in denying this claim.

7    (ECF No. 13-80 at 7.)

8         The Court reaches only the *Strickland* performance prong for ground 3(C) and defers to

9    counsel's reasoned judgment and the state supreme court's reasonable application of *Strickland* to

10   the record. *See Pinholster*, 563 U.S. at 190 (The analysis of a claim of ineffective assistance of

11   counsel is doubly deferential where the court takes a highly deferential look at counsel's

12   performance through the deferential lens of § 2254(d).).

13        Trial counsel's tactical decision that a medical expert was unnecessary to rebut Ravish's

14   testimony was an objectively reasonable exercise of professional judgment based on counsels'

15   perspective at the time. *Strickland*, 466 U.S. at 689–90. Trial counsel thought it unnecessary to

16   call a SANE expert because he believed Ravish's report was weak, and he could undermine her

17   testimony with cross-examination showing her findings were inconsistent with Minko's story and

18   were consistent Minko's activities with Smith and vomiting on the side of the road. *See*

19   *Harrington*, 562 U.S. at 111 (Noting "[i]n many instances cross-examination will be sufficient to

20   expose defects in [a State] expert's presentation" and sometimes "the best strategy can be to say

21   that there is too much doubt about the State's theory for a jury to convict.").

22        Trial counsel's decision not to call Dr. Rigueras because he might be discredited as biased

23   due to his friendship with Joseph was objectively reasonable. Counsel's failure to pursue medical

24   expert testimony about panic attacks was objectively reasonable based on counsel's tactical

25   perception that Minko's intoxication, youth, and shame, were more believable explanations.

26        The state supreme court's application of *Strickland's* performance prong in rejecting this

27   claim was objectively reasonable. Joseph is not entitled to federal habeas relief for ground 3(C).

28   ///

D.  Ground 4 — Cumulative Error

Joseph contends the cumulative effect of the errors alleged in grounds 1 to 3 warrant habeas relief. (ECF No. 1 at 21.) The state supreme court rejected this claim on the following basis:

> Lastly, Joseph argues that multiple instances of deficient performance cumulate to warrant relief. Assuming that counsel's failure to challenge an inadequately noticed expert witness was deficient, Joseph has identified only that omission and trial counsel's failure to request a limiting instruction on res gestae evidence. Even if multiple deficiencies may be cumulated to demonstrate prejudice, as the prejudice related to each instance of deficient performance was meager, Joseph has failed to show that their cumulative impact warrants relief. *See McConnell v. State,* 125 Nev. 243, 259 & n.17, 212 P.3d 307, 318 & n.17 (2009). The district court therefore did not err in denying this claim.

(ECF No. 13-80 at 9.)

"[T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 927–28 (9th Cir. 2007) (citing *Donnelly*, 416 U.S. at 643; *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973)). "[C]umulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citing *Donnelly*, 416 U.S. at 643.) "Such 'infection' occurs where the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Like the state supreme court, the Court found only two potential errors: Trial counsel's failure to obtain a cautionary instruction for the evidence admitted as *res gestae* and failure to object to the State's tardy disclosure of the curriculum vitae for the State's SANE expert, neither of which constituted prejudicial error. The state supreme court's application of Supreme Court authority in rejecting this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court authority and was not based on an unreasonable determination of the facts. Joseph is therefore not entitled to federal habeas relief for ground 4.

V.  Certificate of Appealability

This is a final order adverse to Joseph. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore

has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, the Court finds a certificate of appealability is unwarranted.

VI.  Conclusion

**IT IS THEREFORE ORDERED** that the petition (ECF No. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the request for an evidentiary hearing (ECF No. 1 at 11–12) is **DENIED**.

**IT IS FURTHER ORDERED** the Clerk of the Court is directed to substitute Calvin Johnson for Respondent Brian Williams.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly and close this case.

Dated:   November 24, 2021

_____
KENT J. DAWSON
UNITED STATES DISTRICT JUDGE